[No. 17368. *En Banc.* January 3, 1923.]

THE STATE OF WASHINGTON, *Respondent,* v.
O. S. LARSON, *Appellant.*[1]

EMBEZZLEMENT (18)—WEIGHT AND SUFFICIENCY OF EVIDENCE. In a prosecution of the vice president of a Tacoma bank, for embezzlement of $17,500 which he caused to be deposited in an affiliated Seattle bank, to meet his obligation on his stock in the latter bank, a conviction is sustained, where his telegram directing the deposit is capable of the construction that he had possession of checks and securities that would make the bank good, and where the whole tenor of the stockholders' agreement which he signed is to the effect that he was personally obligating himself because interested in the Seattle bank; notwithstanding that he testified that he did not sign individually but only on behalf of the Tacoma bank, which was not directly contradicted; since the jury was not compelled to believe his self serving declaration.

SAME (2)—POSSESSION—CHARACTER IN WHICH PROPERTY IS HELD. Under Rem. Comp. Stat., § 2601, relating to larceny by one having possession or control of property in a fiduciary capacity, the moneys of a bank are lawfully in possession of the vice president and managing officer to such an extent that he may be guilty of embezzlement, without having actual possession, if he caused its withdrawal with intent to deprive or defraud the bank thereof; and it is immaterial that the transaction took the form of a loan.

BANKS (4-1)—CRIMINAL LAW (9-1)—OFFENSES—MERGER. Rem. Comp. Stat., § 3259 (of the Banking Act) making it a felony for any officer to borrow money of the bank without the approval by resolution of the board of directors, creates a new and independent

[1]Reported in 211 Pac. 885.

STATE v. LARSON.

crime; but at the same time, he may be guilty of larceny by embezzlement under the general statutes, where there is sufficient proof of felonious intent.

EMBEZZLEMENT (15)—EVIDENCE—ADMISSIBILITY—INTENT. In a prosecution of a vice president for the embezzlement of money which he caused the bank to loan to him, it is competent for the state to show that the board of directors had not authorized the loan, which was required by statute, as tending to show a felonious intent.

SAME (20)—INSTRUCTIONS. In the prosecution of a vice president of a bank for embezzlement, an instruction that a consciousness of no right to take the property or money is sufficient to constitute a felonious intent, is not error where it was given to enlighten the jury as to what state of mind would constitute felonious intent, and the jury were plainly told that the accused could not be found guilty unless he took the money with a felonious intent to deprive the bank thereof.

SAME (20). In such a case, an instruction that the thing must be taken without any claim of "title" preferred in good faith is not erroneous, although the word "right" would have been better, where, construed in connection with the one immediately preceding, no prejudice could have resulted.

SAME (20). In such a case, it is not prejudicial error to give an instruction as to defendant's taking the money "without first receiving authority," when coupled with the further statement that he would be guilty if the board had not given authority and if he took the money with intent to deprive the bank thereof.

SAME (20). In such a case, upon a request to instruct the jury that accused would not be guilty if he did not take the money with intent to "permanently" deprive the bank thereof, it is not error to strike out the word permanently, since the law of embezzlement as defined by Rem. Comp. Stat., § 2601, applies, and intent to repay or make restitution is no defense.

CRIMINAL LAW (311)—TRIAL—INSTRUCTIONS AS A WHOLE. It is not error to refuse to give requested instructions that are sufficiently covered in the instructions taken as a whole.

SAME (244)—TRIAL—MISCONDUCT OF COUNSEL—CORRECTION. Misconduct of the prosecuting attorney in argument to the jury is not ground for reversal, where it cannot be said that it was prejudicial, and there was no request to instruct the jury to disregard the remarks.

Appeal from a judgment of the superior court for Pierce county, Chapman, J., entered December 13,

1921, upon a trial and conviction of embezzlement. Affirmed.

*Tucker & Hyland* and *Hayden, Langhorne & Metzger*, for appellant.

*J. W. Selden, J. A. Sorley,* and *Rex S. Roudebush,* for respondent.

TOLMAN, J.—The information charged:

"That the said O. S. Larson in the county of Pierce, in the state of Washington, on or about the 24th day of December, nineteen hundred and nineteen, then and there being Vice-President and manager of the Scandinavian American Bank of Tacoma, a banking corporation organized and existing under and by virtue of the laws of the state of Washington, and while having under his control, as such Vice-President and Manager, the sum of $17,500 lawful money of the United States of America, did then and there unlawfully and feloniously and with intent to defraud the owner thereof, to wit: Scandinavian American Bank of Tacoma, a banking corporation, withhold, secret and appropriate said property and money to his own use, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Washington."

Defendant has appealed from a judgment of conviction.

The following is a fair summary of the facts: The appellant was the vice-president and manager of the Scandinavian-American Bank at Tacoma. There was also a Scandinavian-American Bank at Seattle, in which the appellant was a stockholder. There was a close business relationship between these two banks, and the same man was the president of both. The Seattle bank was a member of the Federal Reserve Bank, but the Tacoma bank was not a member. The board of governors of the Federal Reserve Bank had

been threatening to immediately cancel the membership of the Seattle bank because of the financial instability of that bank. If the Federal bank carried out this threat, it was considered certain that it would greatly injure the Seattle bank, and also the Tacoma bank, because of the close relationship of the latter to the former.

The appellant was called upon to intercede with the Federal authorities, and for that purpose he proceeded to the city of Washington to consult with the chairman of the governors of the Federal bank. There he was informed that he should take up this matter with the president of the Federal Reserve bank at San Francisco. Thither he at once went, and after some days of consultation, a tentative agreement was made whereby the membership of the Seattle bank would not be cancelled, provided that, within a designated time, it required its stockholders to pay an assessment of one hundred per cent upon its capital stock, which amounted to one million dollars.

As a result of this conference, most of the larger stockholders of the Seattle bank, including the appellant, signed and executed among themselves a written agreement, the effect of which was that there should be an immediate call for an assessment of one hundred cents on the dollar of all the capital stock of the Seattle bank, and that the signers of the agreement would guarantee that such sums of money should be placed to the credit of the Seattle bank, and that thirty-five per cent of the total, or three hundred and fifty thousand dollars, should be deposited with the Federal Reserve Bank to the credit of the Seattle bank within two or three days from the signing of such agreement. The appellant signed the agreement individually binding himself in the sum of fifty thousand dollars. By the terms of the agreement, it was necessary that each one

of the signers should at once raise for the purposes mentioned thirty-five per cent of the amount signed for by him, which in the case of the appellant was seventeen thousand five hundred dollars. Immediately after the execution of this agreement, appellant wired the bank at Tacoma as follows:

"On Wednesday afternoon December twenty-fourth deposit with Federal Reserve Bank at Seattle our Cashier's check two hundred eighty-six thousand six hundred twenty five dollars to be credited to Scandinavian-American Bank of Seattle special assessment fund bringing securities and checks will arrive Wednesday afternoon.     O. S. Larson, vice-president."

Upon receipt of this telegram, the Tacoma bank deposited the sum of money therein mentioned as directed, seventeen thousand five hundred dollars of which was on account of the subscription made by the appellant.

A great many claims of error have been assigned by the appellant.

I. It is first contended by him that his motion for an instructed verdict in his favor should have been granted by the court because the evidence wholly failed to show that he was guilty of the crime with which he was charged. It is contended that the testimony shows conclusively that, in the signing of the agreement at San Francisco and in sending the telegram, and in paying the seventeen thousand five hundred dollars to the credit of the Seattle bank, the appellant was acting solely on behalf of, and for the benefit of the Tacoma bank, and consequently there was an entire absence of any intent to defraud that bank. A number of witnesses testified that, when appellant signed the agreement in San Francisco, he stated that he could not personally sign the agreement because he was not in a financial situation to do so, and that his

various obligations to the Tacoma bank had "pauperized" him, and that his attorneys then suggested that he sign individually but for the use of the Tacoma bank only, and that, as a matter of fact, he signed the agreement individually, not with the intention of binding himself thereby, but with the intention of binding the Tacoma bank, of which he was manager and vice-president. There was also testimony to the effect that, when he returned to Tacoma within a few days, he told some of the directors or officers of the Tacoma bank that he had signed the agreement in San Francisco individually, but in truth and in fact for the use and benefit of the Tacoma bank.

There was no direct testimony contradicting that above recited. However persuasive it may be, the jury was not bound to accept it. There was sufficient testimony upon which the jury might conclude that appellant signed the San Francisco agreement for his own benefit, and that the seventeen thousand five hundred dollars obtained from the Tacoma bank was for his individual benefit as a stockholder of the Seattle bank. In the first place, the agreement was signed by the appellant personally and not for the bank, and the whole tenor of the San Francisco contract is to the effect that the signers were personally obligating themselves because they were interested in, and stockholders of the Seattle bank; as, for illustration, it is stated in that agreement that,

"The express purpose of this contract is the placing of the Scandinavian-American Bank of Seattle upon a sound financial basis by the levy and collection by said bank of an assessment of one hundred per cent, aggregating one million dollars, and it is agreed that such purpose is for the mutual benefit of each of the subscribers hereto and constitutes a sufficient consideration for the execution of this agreement."

In another place the contract says that, "the respective parties hereto, as stockholders of the Scandinavian American Bank of Seattle do hereby appoint," etc. Many other similar expressions may be found in the agreement. Moreover, the testimony that appellant signed the agreement for the bank, no matter how often repeated, or how many witnesses so testified, all had its source in the self-serving declarations of the appellant to that effect, and these declarations were to be weighed in the light of all of the circumstances which have been pointed out, including the quoted telegram sent by appellant to the Tacoma bank, which is susceptible of being construed as a representation that he was then in possession of checks and securities which would make the bank whole on the transaction. The jury had a right, under this testimony, to conclude, as it must have concluded, that, in signing the agreement and obtaining the money in question, the appellant acted solely for himself as a stockholder of the Seattle bank, and not for or on behalf of the Tacoma bank.

II.   Another question which arises is: Conceding that whatever was done by the appellant was done for his own use and benefit, do the facts, as shown, show him to be guilty of the crime of larceny by embezzlement? It is argued that at most the transaction amounted to a loan obtained by the appellant from the Tacoma bank, and that such a transaction cannot amount to larceny. We cannot accept this view as a legal proposition necessarily applicable to the facts of this case. The mere fact that an officer of a bank makes a loan from that institution however regular and usual it may, on its face, appear to be, does not necessarily deny intent upon his part to defraud the bank by converting the money to his own use. The statute, Rem. Comp. Stat., § 2601, under which the information was filed, reads as follows: "Every person

who, with intent to deprive or defraud the owner thereof— . . . . . . . .

"(3)   Having any property in his possession, custody or control, as bailee, factor, pledgee, servant, attorney, agent, employee, trustee, executor, administrator, guardian or officer of any person, estate, association or corporation, . . . . . . . shall secrete, withhold or appropriate the same to his own use or to the use of any person other than the true owner or person entitled thereto; . . . . . . . . . .

"Steals such property and shall be guilty of larceny."

There are three main elements involved in this case: First, a trust relationship existing between the appellant and the Tacoma bank; second, possession in the appellant as an officer of the bank of the money taken; and third, the taking of the money with intention of depriving or defrauding the bank thereof for his own use. All of these elements were shown, at least to some extent, by the testimony in this case. As vice-president and managing officer of the Tacoma bank, the moneys of that bank were lawfully in his possession to such an extent as that, by feloniously taking the same, he might be guilty of embezzlement. It is not necessary that he should have actual physical possession of the money, nor is it necessary that he have the exclusive possession of it. Being in a position of trust and thus having possession of the bank's money, he may be guilty of larceny providing he take the money feloniously and with the purpose and intent to defraud the bank and for his own use. The mere fact that the transaction may take the form of a loan would not necessarily deprive it of its criminality. Where there is some testimony tending to show that such officer of a bank takes the money feloniously and for his own use, the jury may distinguish such a transaction from one which is a bona fide loan of money.

The case of *Reeves v. State,* 95 Ala. 31, 11 South. 158, is not at all unlike this one. There an officer of a bank caused the bank to make a loan to him of certain sums of money, and he was charged with embezzling from the bank, and the court held that such an officer may be convicted of embezzlement or fraud in converting to his own use money belonging to the bank, although he possesses control thereof, and that it was immaterial whether his acts were perpetrated secretly or openly; and that, if such acts were consummated under the guise of a bona fide loan made with the assent of the other officers of the bank, such would not eliminate the criminality of the act, and that the fraud itself might be inferred from the misappropriation of the funds, the court saying:

"Money, property or effects, however, belonging to, or in the possession of such bank, or deposited therein, may at the same time be in the possession of the bank and of such officer, agent, clerk or servant, by virtue of his office, agency or employment; and if they were, previously to their wrongful appropriation, lawfully in the possession and custody of the bank and the defendant as an officer, agent, clerk or servant of the bank, and are, while so held by him, fraudulently converted to his own use, this would be embezzlement, or fraudulent conversion, within the terms of the statute. Exclusive possession, therefore, of the money, property or effects by the accused, at the time of their wrongful conversion to his own use, is not necessary in order to constitute the offense created by this statute.

"If the money, property or effects of the bank, or, in other words, the business of the bank, of which such money, property or effects constitute a part, are actually or practically intrusted to the care and management of such officer, agent, clerk or servant, to such an extent that by virtue of his office, agency or employment, he has the actual custody or possession of such money, property or effects, or such access thereto as enables him to exercise control over the same, and that

would place him in the lawful possession of such money, property or effects, and if while so in the lawful possession of such money, property or effects, as above stated, he fraudulently converts any portion thereof to his own use, he would thereby commit the offense denounced by the statute.

"Stating the proposition in another form, it may be said that, if the office, agency or employment of the accused gives him joint or concurrent possession and custody of the money, property or effects of the bank with the cashier, teller, or other officer or agent of the bank, and if he, while so in possession, either alone or jointly with such other officers or agents of the bank, fraudulently converts such money, property or effects, or any part thereof, to his own use, he would be guilty of embezzlement within the meaning of the statute."

The court further said:

"Loans may be made contrary to law, and in disregard of the usual and ordinary precautions taken by banks generally, without subjecting the officers by or to whom such loans may be made to the charge of embezzlement, although they may be palpable violations of duty. But we do not question that the statute may be violated by fraudulent transactions under the guise of loans, made with full knowledge of the managing officers or agents of the bank. The distinction is between the making of mere irregular, unsafe, or reckless loans of the bank's money, which would amount to maladministration only, and pretended loans, made in bad faith for personal advantage and with fraudulent intent, the pretended borrower being an officer, agent, clerk or servant, having control and custody of money of the bank by virtue of his office or employment, which control and custody is shared by those making the pretended fraudulent loan,. and who participate in the fraudulent purpose of the pretended borrower."

In the case of *State v. Kortgaard,* 62 Minn. 7, 64 N. W. 51, which was somewhat similar to this one, it was held that, if a bank officer appropriated to his own use the funds of the bank entrusted to his custody with

intent to deprive the bank of its property, it is none
the less embezzlement because done under the guise or
form of a loan to himself, or an overdraft of his
account.

But it is said that, if the appellant is guilty of any
offense, it is the violation of the Laws of 1917, p. 297,
§ 52; Rem. Comp. Stat., § 3259, commonly known as the
banking act, which provides that no bank shall loan
any of its money to any officer unless a resolution au-
thorizing the loan be. made and approved by the board
of directors, and that any officer borrowing money in
violation of this section shall be guilty of a felony.

That act creates a new and independent crime. It
is not a part of, nor absorbed in the general statute
with reference to larceny. One may be guilty of violat-
ing the banking act and at the same time be guilty of
larceny. Intent to feloniously deprive the bank of its
property, while an essential element to be proven un-
der the larceny statute, is not such under the banking
act. The jury had a right, of course, to take into con-
sideration all of the circumstances and the evidence in
determining whether the appellant had a felonious in-
tent to deprive the bank of its property. It had a right
to consider the circumstances under which he took the
money, the fact that the board of directors had not
authorized him to do so, the fact or inference that he
was insolvent, and would be unable to or did not intend
to repay to the bank the amount he had taken, and
other like circumstances shown by the evidence. We
conclude that there was ·sufficient testimony upon
which the jury might base its verdict.

III. Error is also based upon the fact that the court
permitted a witness for the state to testify that the
board of directors of the bank, as a body, had never
authorized the appellant to withdraw from the bank
the money in question. This testimony was admissible

for the purpose of tending to show that the appellant feloniously took the bank's money. If the board of directors had authorized a loan to the appellant for the purposes here involved, such fact would have been competent testimony on his behalf, tending to show a lack of felonious intent on his part; and so, also, the lack of action on the part of the board was admissible on behalf of the state for the purpose of showing a felonious intent on the part of appellant.

IV. Exception was taken to the court's instruction number ten, and is here assigned as error. In that instruction the court said:

"The intention to steal is the intention to take the goods or money of another and to appropriate the same to his own use and thereby deprive the owner thereof. A *consciousness of no right to take the property or money is sufficient to constitute a felonious intent. In other words, the thing must be taken without any claim of title preferred in good faith.* If you find that such felonious intent existed, then it is wholly immaterial whether the money was taken openly or not or in what manner it was appropriated."

Particular objection is taken to that portion of the instruction shown in italics. The two sentences must be separately considered. Appellant strongly contends that, "the consciousness of no right to take property or money," is wholly insufficient to constitute a felonious intent. In a number of instructions the court had plainly told the jury that the appellant could not be found guilty unless he had taken the money with a felonious intent to deprive the bank of it. By this instruction the court was trying to enlighten the jury as to what state of mind might or could constitute felonious intent. The instruction certainly amounted to nothing more nor less than that, if one took property from another knowing he had no right so to do, a felonious intent therefrom might be inferred, and this, it

seems to us, is a correct statement. If one take property belonging to another in the *bona fide* belief that he has a right to take it, no felonious intent can be inferred therefrom. The contrary conclusion must result where the taker is conscious of the fact that he is committing a wrong in taking the property.

It is also claimed that the other sentence to the effect that "the thing must be taken without any claim of title preferred in good faith," is erroneous because of the use of the word "title." It may be conceded that the word "right" would have been better, but when this sentence is construed with the one immediately above and, also, in connection with the other instructions, it cannot be said there was any prejudicial error.

V. Complaint is also made of the court's instruction Number 14, which in part reads as follows:

" . . . . and you further find from the evidence, beyond a reasonable doubt, that the defendant Larson advanced said sum of money *without first receiving authority so to do by a vote of directors of the Scandinavian American Bank of Tacoma,* and did so for his own use, respecting the Scandinavian American Bank of Seattle and the Scandinavian American Bank of Tacoma, and with intent to deprive or defraud the Scandinavian American Bank of Tacoma thereof, then I instruct you that you should find the defendant Larson guilty as charged."

Particular complaint is made concerning that portion of the instruction which we have put in italics. It is argued that this instruction makes the appellant's guilt depend not on intent, but on the proposition whether he had received authority from the board of directors to take the money. It must be conceded that this instruction is not very clear and is not all it should have been, but we are convinced that there is nothing in it prejudicial to the interests of the appellant. If

the court had simply told the jury that they must find the appellant guilty if he took the money without first receiving authority from the board of directors, it is probable that it would be erroneous to a prejudicial degree; but the instruction goes much farther and states that, if the board had not given authority to take the money and that appellant took it for his own use with intent to deprive the Tacoma bank thereof, then the appellant would be guilty. Taking the instruction as a whole, and particularly in connection with the other instructions covering the same idea involved in this one, we cannot say that this instruction was so far erroneous or misleading as to have been prejudicial to the appellant.

VI. It is claimed that the court erred in refusing to give appellant's requested instruction, as follows:

"You are further instructed that although you may believe from the evidence that the defendant Larson took the sum of money mentioned in the information, still if you are not satisfied beyond a reasonable doubt that he took the same with intent to *permanently* deprive the bank thereof, then you should acquit him."

The court gave this instruction after striking the word "permanently" and putting in its place the words "to deprive and defraud." Appellant cites some cases which seem to hold that one is not guilty of larceny unless he intends *permanently* to deprive the owner of the property taken.

It must be borne in mind, however, that this is a prosecution for larceny by embezzlement under sub. 3 of the larceny statute, § 2601 Rem. Comp. Stat. [P. C. § 8944], which, so far as here material, reads:

"Every person who, with intent to deprive or defraud the owner thereof—    .   .   .

"(3)   Having any property in his possession, custody or control, as bailee, factor, pledgee, servant, at-

torney, agent, employee, trustee, executor, administrator, guardian or officer of any person, estate, association or corporation or as a public officer, or a person authorized by agreement or competent authority to take or hold such possession, custody or control, or as a finder thereof, shall secrete, withhold or appropriate the same to his own use or to the use of any person other than the true owner or person entitled thereto;
. . .
"Steals such property and shall be guilty of larceny."

Therefore the law of embezzlement must be applied. The general rule seems to be well expressed in Volume 20, Corpus Juris, at page 455, where it is said:

"The fact that an embezzler offers to return or does return what he has fraudulently converted, or that he or his sureties settle with the owner, does not bar a prosecution for embezzlement, the offense being complete at the time of the conversion."

Not only is this the general rule, but when applied to the facts in this case, the subject of the larceny being money, and appellant, as the jury found, having unlawfully and feloniously, and with intent to defraud, appropriated this money to his own use, and having in that use put it beyond his control, he, of course, permanently deprived the bank of the money taken, and had the instruction as worded been given, it would have, in effect, advised the jury that an intention on his part to repay or make restitution would wipe out the crime or purge the appellant of the offense. Such is not the law. The intention to return the money embezzled, or even the actual restitution, does not absolve the guilty party.

VII. Appellant complains that his requested instructions, numbers 5 and 6, were not given. They particularly set out his line of defense and would have informed the jury that, if he signed the agreement in

San Francisco for and on behalf of the Tacoma bank, and not in his individual right, and if he took the money in question from the Tacoma bank for the use and benefit of that bank alone, then he could not be found guilty. In instruction No. 13, the court gave the substance of these two requests for he there said: ''If the money was used by the defendant for a purpose that he honestly believed was for the benefit of the bank of which he was vice-president and general manager, and without any intent or purpose on his part to appropriate the same to his own use or to deprive or defraud the said bank thereof, then you will find the defendant not guilty.'' We are unable, therefore, to conclude that the court erred in refusing to give the appellant's requests.

VIII. Misconduct of the prosecuting attorney in his argument to the jury is finally urged as cause for reversing the case. While, in his enthusiasm for the case, he may to some extent have been over-emphatic, yet we cannot say that anything said by him was sufficient to prejudice the jury against the appellant, and particularly is this true where, as here, the appellant did not then or at any time request the court to instruct the jury to disregard the remarks of the state's attorney.

A very careful consideration of the whole case convinces us that there was no prejudicial error, and that the judgment must be affirmed. It is so ordered.

PARKER, C. J., HOLCOMB, PEMBERTON, MITCHELL, and BRIDGES, JJ., concur.